## Mitchell v. Commonwealth.

May 7, 1940

Flem D. Sampson, Judge.

J. Milton Luker and Victor A. Jordan for appellant.

Hubert Meredith, Attorney General, for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

Under indictment for the murder of Claude Hubbard, and which charged two former convictions for felony, Ernest Mitchell has been found guilty and sentenced to life imprisonment.

By this appeal he is seeking a reversal on the grounds that the court erred in refusing to permit a jury to view the scene of the homicide and in instructing the jury.

On the day of the homicide, deceased, his mother and a sister went to Corbin. Williard Bryant and his wife who were neighbors of the Hubbards and Robert Humfleet, sometimes called Robert Humfleet Bryant, were also in Corbin. All of these parties returned home in a taxi. Mrs. Hubbard and her daughter alighted at their home and deceased and Robert Humfleet went on to the Bryant home only a short distance beyond the Hubbard place. Humfleet testified that he, Williard Bryant and deceased had taken a few drinks of whiskey and his evidence indicates that Bryant was noticeably under the influence of these drinks and for that reason his wife procured his pistol, removed the cartridges and gave it to Humfleet to keep until the effects of Bryant's drinking had passed away. He further testified that he saw two other men at Bryants and recognized one of them as the brother of appellant but that at the time he did not know appellant. It is not denied that appellant who had recently escaped from the state reformatory in Oldham county and was evading officers was at the home of Bryant at the time.

The evidence for the commonwealth is to the effect that about dark Mrs. Hubbard went to Bryant's for a bucket of water and told her son the evening meal was about ready. A few minutes after her return home she was followed by her son and Humfleet, who remained there for 15 or 20 minutes and after procuring some cartridges for Bryant's pistol started toward Corbin. Shortly after they left, appellant, his brother and Williard Bryant came to the Hubbard home for Bryant's pistol and when informed that deceased and Humfleet had gone to Corbin proceeded to search the house and premises for them. Bryant and appellant were calling Humfleet and deceased vile names and threatening to kill them if they found them. After they had about completed the search some shots were fired down near the Hubbard barn and immediately thereafter appellant who had a high powered rifle fired two shots in that direction, one of them killing Claude Hubbard and the other wounding Humfleet.

Mrs. Hubbard and two of her daughters testified that they were on the porch of their home when the shots were fired near the barn and saw the flash of the pistol going straight up in the air. Humfleet testified that after he and deceased had gone a short distance

toward Corbin, the latter decided to return to the Hubbard home; that when they reached a point near the barn deceased suggested that they try Bryant's pistol; that he fired the pistol straight up or practically so, then handed it to Hubbard who was holding it straight up preparatory to firing it when he was shot and killed; that deceased stumbled to the opposite side of the road where he fell dead. Humfleet stated that he was shot in the shoulder; that he immediately started toward the Hubbard home where he came upon appellant with a rifle.

The evidence of appellant, his brother and Bryant. is to the effect that the former had decided to leave the Bryant home under cover of darkness; that Bryant merely accompanied him as far as the Hubbard home; that when they arrived in front of the Hubbard home a number of shots were fired in their direction from a point near the barn; that they could hear the sound of the bullets passing near them. They denied that they asked about deceased or Humfleet or searched for them, or that they made the statements concerning them as testified by Mrs. Hubbard and her daughters. Appellant testified that he thought the shots were being fired at him and his companion and that he fired two shots in that direction in defense of himself, his brother and Bryant. A neighbor woman who as we understand lived in the direction of Bryant's home also testified that she heard some of the bullets fired from near the barn fall or strike near her home. Appellant introduced evidence tending to show that the place in the road where Hubbard and Humfleet were at the time of the shooting could not be seen from the porch of the Hubbard home because some apple trees and the barn cut off the view.

During the progress of the trial appellant made a motion that the jury be sent to view the scene of the shooting which was overruled and after the jury had deliberated for some time they returned to the court room and one of them requested that they be sent to view the scene. This request was refused. Counsel for appellant are vigorously insisting that in view of the conflict in evidence as to whether Mrs. Hubbard and her daughters could see the flash from the pistol the court committed prejudicial error in overruling such motion. and refusing the juror's request.

Section 236 of the Criminal Code of Practice provides in substance that when in the opinion of the trial judge it is necessary that the jury view the place where the crime was alleged to have been committed or in which any other material act occurred he may order the jury to be conducted in a body as therein directed to view the place. But this court has held that the question as to whether that should be done is one of judicial discretion and that a judgment of conviction will not be reversed because of refusal of the court to permit the jury to view the scene unless it appears that there has been an abuse of that discretion. See Morgan v. Commonwealth, 257 Ky. 691, 79 S. W. (2d) 1. The jailer of Knox county and others who were with him at the scene of the homicide and who testified that the place where Hubbard and Humfleet were standing when the shots were fired could not be seen from the porch of the Hubbard home stated that the place was pointed out to them by some one whom they did not know. The place where deceased and Humfleet were standing cannot be determined from the evidence with any degree of certainty and it must be kept in mind that deceased walked across the road after he was shot and fell on the opposite side. While the jailer testified that the barn was between the house and the place pointed out to him on the road he further testified that he could not state whether the flash from the pistol fired in that place could be seen from the house; and there is no evidence to the effect that the flash of the pistol could not have been seen even though the barn or a portion of it was between the porch and the spot where the party firing the pistol was standing. The evidence of Humfleet disclosed that he was not sufficiently acquainted with the premises and surroundings to testify definitely concerning them and the evidence concerning the place where he and Hubbard were at the time he fired the pistol is so indefinite and uncertain as to make it apparent that the jury could not in any way have been enlightened by viewing the scene. In the proven circumstances we would not feel justified in holding that there was an abuse of discretion upon the part of the court in not having the jury conveyed to the scene.

Practically the only criticism of the instructions is directed at No. 5. All the other instructions are in the usual and proper form except that the instruction on

murder and manslaughter makes no reference to the punishment that might be inflicted. Instruction No. 5 first properly instructed the jury as to the punishment that might be imposed if they found appellant guilty of either murder or manslaughter and the latter part of the instruction in effect told the jury that if they found appellant guilty of either murder or manslaughter as set out in the other instructions and further believed from the evidence beyond a reasonable doubt that he had formerly been convicted of two felonies, the last of which was committed after the conviction for the first, etc., the punishment might be fixed at imprisonment for life, unless they should find him guilty of willful murder and fix his punishment at death. The only complaint made of this instruction is that it gives undue prominence to certain facts and is calculated to lead the jury to believe that if they found appellant guilty of either murder or voluntary manslaughter they could not make a verdict except under this instruction and find appellant guilty under the Habitual Criminal Act, Kentucky Statutes, Section 1130. The case of Murphy v. Commonwealth, 205 Ky. 493, 266 S. W. 33, and a number of other cases of like tenor concerning instructions are cited, but in all those cases the instructions condemned gave undue prominence to matters in evidence. In Commonwealth v. Thomas, 104 S. W. 326, 329, 31 Ky. Law Rep. 899, cited in appellant's brief among other things it was said:

"This court has frequently held that the trial court should not single out specific facts or groups of facts and give them undue prominence in the instructions. The instruction should contain only the law predicated upon the evidence introduced, and should be expressed in concise and unambiguous language."

The instruction complained of in this instance made no reference to any particular fact or group of facts but left it to the jury to determine from the evidence as a whole the guilt or innocence of appellant and the punishment to be imposed in any state of case, as they might believe from the evidence.

Judgment affirmed.